UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THONG DANG, | No. C 05-4254 SI (pr) |
|     Petitioner, | **ORDER DENYING HABEAS PETITION** |
|     v. | |
| S.W. ORNOSKI, warden, | |
|     Respondent. | |

## INTRODUCTION

Thong Dang, a prisoner at San Quentin State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Thong Dang was convicted in Orange County Superior Court of first degree murder and was found to have used a firearm in the commission of the offense. In 1986, he was sentenced to 25 years to life in prison. His habeas petition does not concern that conviction directly, but instead focuses on a March 2, 2005 decision by a panel of the Board of Prison Terms ("BPT") finding him not suitable for parole.

The BPT identified several factors in support of its determination that Dang was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released. The factors identified included the circumstances of the offense, pre-

offense behavior, in-prison behavior, and inadequate parole plans. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Dang sought relief in the California courts. The Orange County Superior Court denied his petition for writ of habeas corpus in 2004 in a reasoned order. Resp. Exh. 6. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review.

Dang then filed his federal petition for a writ of habeas corpus. His habeas petition alleged that his right to due process was violated because there was insufficient evidence to support the decision and the decision-maker was biased. After an unsuccessful motion to dismiss, respondent filed an answer. Petitioner filed a traverse. The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action occurred at San Quentin State Prison in Marin County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.  Sufficiency Of Evidence Claim

   1.   Due Process Requires That Some evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support

3

the conclusion reached'" by the parole board. Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

Furthermore, and of key importance, the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole). The familiar argument that the BPT cannot rely on these factors is based on the Ninth Circuit's statements in Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), that suggested that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. In Biggs, the Ninth Circuit upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. These statements were dicta and not clearly established federal law as set forth by the Supreme Court, such that the state court's refusal to adopt the Biggs reasoning would be a decision contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court. The Ninth Circuit recently backed away from the Biggs statements, and confirmed that these statements from Biggs were dicta and were inappropriate under § 2254. See Sass, 461 F.3d at 1129. "Under AEDPA it is not our function to speculate about how future

4

1  parole hearings could proceed." Sass, 461 F.3d at 1129.

2  What little guidance has come from the Supreme Court suggests that judicial review
3  should be extremely deferential to the original decision-maker in the parole context.  In addition
4  to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court
5  comments suggest that the judiciary should be quite mindful of the subjective and predictive
6  nature of a parole board's decision.  See Greenholtz, 442 U.S. at 13.  "No ideal, error-free way
7  to make parole-release decisions has been developed; the whole question has been and will
8  continue to be the subject of experimentation involving analysis of psychological factors
9  combined with fact evaluation guided by the practical experience of the actual parole
10 decisionmakers in predicting future behavior.  Our system of federalism encourages this state
11 experimentation."  Id.; see also id. at 8.

12 Past criminal conduct is not some arbitrary factor like eye color that has nothing to do
13 with present dangerousness.  Recidivism concerns are genuine.  See Ewing v. California, 538
14 U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were
15 arrested again within three years of their release).  California's parole scheme does not offend
16 due process by allowing the BPT to predict that an inmate presents a present danger based on
17 a murder he committed many years ago.

18 Having determined that there is a due process right, and that some evidence is the
19 evidentiary standard for judicial review, the next step is to look to state law because that sets the
20 criteria to which the some evidence standard applies.  One must look to state law to answer the
21 question, "'some evidence' of what?"

23     2. <u>State Law Standards For Parole For Murderers In California</u>

24 California uses indeterminate sentences for most non-capital murderers, with the term
25 being life imprisonment and parole eligibility after a certain minimum number of years.  A first
26 degree murder conviction yields a minimum term of 25 years to life and a second degree murder
27 conviction yields a base term of 15 years to life imprisonment.  See In re Dannenberg, 34 Cal.
28 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal Code § 190.  The upshot

of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of

---

[1] The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

6

danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole"). The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

        3.      <u>Some Evidence Supports The BPT's Decision In Dang's Case</u>

The BPT identified several factors supporting its decision to find Dang unsuitable for parole, i.e., the circumstances of the offense, pre-offense behavior, in-prison behavior, and inadequate parole plans. That court upheld the decision in a reasoned order. Resp. Exh. 6. The Orange County court determined that the BPT's determination that Dang was unsuitable was supported and was based on factors the BPT was allowed to consider. The order is silent on the evidentiary standard the court applied, although there is nothing to indicate that the court used anything other than the some evidence standard. Because the Orange County Superior Court's decision is the last reasoned decision, that is the decision to which 2254(d) applies. See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 2041 (2006).

        a.      <u>Commitment Offense</u>

The BPT considered the circumstances of the murder and concluded that it was an carried out in an especially cruel and callous manner. The BPT determined that there were multiple victims attacked in separate incidents, the offense was carried out in a dispassionate and calculated manner like an execution-style murder, the murder was done in a manner that showed a callous disregard for another human being, and the motive was inexplicable.

The first degree murder conviction stemmed from a home invasion in April 1985. Most of the reports about the murder also mention a separate criminal episode four months earlier (on January 1, 1985), in which Dang and his partners robbed a pool hall. During that robbery, they fired a shotgun into the wall near the owner and tied up the owner. The home invasion was described in an appellate court decision that the BPT read into the record:

> On [April 19, 1985] Sam Dung and nine other people were playing cards for money in the apartment of Anh Nguyen, when four armed and masked men forcibly entered. Dang was identified as one of these men. He entered the room where the game was in session and told the card players to remain where they were. One of the players told Dang, if you want anything, just take it. The lights [went] off and Dang fired his gun into the dark room and ran out. The lights came back on and Dang ran back into the room. One of the men said, you guys, what are you doing here? We are all acquaintance[s]. The lights went off again and Dang fired another shot into the dark room. This time striking Sam Dung. Dang and his confederates fled without taking any money or property. Sam Dung

8

1     died as a result of the wound.

March 2, 2005 BPT hearing transcript ("RT"), pp. 18-19 (errors in source). One of Dang's crime partners testified under a grant of immunity that they planned to rob the card players to pay their rent and that he and Dang earlier had gambled at the same apartment. RT 19-20. The victim's wife recognized Dang when she first opened the door to the robbers who had knocked at the door of the apartment. Resp. Exh. 4, Life Prisoner Evaluation Report, p. 1.

A circumstance tending to indicate unsuitability for parole is that the prisoner "committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2402(c)(1). The BPT considered a circumstance and factors proper under California law.

There was some evidence in the record to support the BPT's determination that the circumstances of the murder indicated unsuitability. The record also supported a determination that murder was committed in a very cruel and callous manner. The record supported the finding that the motive for the killing was very trivial. Dang and his confederates went there to steal money and no motive was offered for why Dang shot the victim. The victim was not offering any resistance and one of the card players had told the robbers to take what they wanted. The record showing that the victim had been shot in the base of the neck supported the determination that the offense was carried out in a dispassionate and calculated manner. There was evidence in the record to support the belief that Dang had targeted the victim for retribution: Dang "was angry with the victim because the victim had reported to police officers [Dang] and his friends were gang members and involved in criminal activities." See Resp. Exh. 3, May 23, 1985 probation fitness report, at p. 7. The BPT identified more than the minimum elements of a first degree murder when it determined that Dang committed the murder in a very cruel manner and

1 with an exceptionally callous disregard for human suffering, as Dang had shot the victim during a home invasion robbery in which the victims had not offered any resistance and had shot the victim in the base of the neck in execution-style manner. See Dannenberg, 34 Cal. 4th at 1071.

The BPT also found that multiple victims had been attacked in separate incidents based on the evidence of the earlier pool hall robbery. The BPT saw these as part of related criminal activities. This court has some concern about the earlier robbery and assault at the pool hall being double-counted, as the record suggests that the pool hall activity resulted in additional convictions and perhaps additional sentences. See Resp. Exh. 4, p. 2; see also Resp. Exh. 1 (judgment of commitment refers to an abstract of judgment for counts 2 and 3, but abstract of judgment is not included in the exhibits). Even if the pool hall criminal activity should not have been considered as a factor in determining whether the circumstances of the murder indicated unsuitability, there were enough other factors present to provide some evidence to support the determination of unsuitability based on the circumstances of the murder alone.

### b. Pre-Offense Behavior

The BPT also relied on Dang's pre-offense criminal and social history for its determination that he was not suitable for parole. Even if the robbery and assault at the pool hall was not properly considered in determining whether the circumstances of the commitment offense showed unsuitability, that information could properly be considered as part of the evidence showing Dang's escalating criminality.

The record provided support for the BPT's determination that Dang was engaged in an escalating pattern of criminal activity. Dang was arrested for the murder before many other criminal charges worked their way through the system, so there are not final dispositions on several charges, see Resp. Exh. 7, but the record still shows a strong pattern of criminal activity in the two years Dang was in California before being incarcerated. Dang was in a small street gang that was busy with criminal activity. Dang admitted that he had committed nine auto burglaries as a juvenile, was in a street gang. See RT 26-28. He had participated in the robbery and assault on the pool hall owner, although Dang denied that he had a gun on that occasion.

10

RT 54. However, he admitted that in yet another crime he had shot a man in the shoulder. See RT 53.

Consideration of and reliance on Dang's pre-offense criminal history was not improper. Although the prisoner's "previous record of violence" on a victim is a specifically listed circumstance and non-violent criminal history is not specifically listed as a circumstance that tends to indicate unsuitability, 15 Cal. Code Regs. § 2402(c)(2), the list of circumstances in § 2402(c) is non-exclusive, and § 2402(b) specifically allows the BPT to consider a great range of relevant and reliable information, such as the prisoner's "past criminal history, including involvement in other criminal misconduct which is reliably documented." Dang's extremely serious prior criminal activity could be considered by the BPT as tending to show unsuitability.

The BPT also determined that Dang had a history of "unstable tumultuous relationships, we're talking about the people you chose to associate yourself with once you came to this country. . . . under unstable social history, the people that you associated with were certainly an unstable social factor." RT 64. There was some evidence to support the determination that Dang had an unstable social history tending to show unsuitability. Dang reported that he had left Vietnam when he was 13, spent two years in a refugee camp, and came to the United States when he was 15 (and committed the murder when he was 17). See RT 24-28. His siblings and parents remained in Vietnam. He first lived in New Orleans and then moved to California twelve months before he committed the murder. There was evidence in the record that he had no stable home while in California, had not stayed in school, and had joined a street gang. Dang urges that he should not be blamed for "his unfortunate history of being uprooted from his family as a factor in denying him parole for having an unstable social history." Petition, p. 2. The BPT was not immigrant bashing; instead, it looked at the circumstances of Dang's two years in the United States objectively: whatever the cause of it, Dang had dropped out of high school, ran away from his cousin's home, and had joined a criminal street gang. See RT 29-30; see also Resp. Exh. 3, May 23, 1985 probation fitness report, pp. 6-7 (police officer related that the man who had brought Dang to California "is not a relative of [Dang's] and wants nothing to do with [Dang] at the present time. He reported to Officer Varner the minor was completely out of

11

1 control and would not attend school. [Dang] has been in California since June of 1984 and has
2 subsequently become a transient.")

#### c. In-Prison Behavior

The BPT found that Dang had not demonstrated sufficient positive change in prison. Dang had received at least six CDC-115 rule violation reports, although the most recent one was ten years before the hearing. See RT 39. Dang also had received six CDC-128(a) counselling memos for minor infractions, the most recent of which occurred just three years before the hearing and was for failing to report for an inmate count. See RT 40. The BPT also noted that the psychological report was not particularly enthusiastic and had predicted that Dang would present a mild to moderate degree of threat to the community. The BPT decision stated that the psychologist's report indicated that Dang's level of dangerousness was decreasing but "also shows that you have a ways to go." RT 65.

Consideration of and reliance on Dang's prison behavior was not improper. His CDC-115s properly could be considered under § 2402(c)(6), which states that serious misconduct in prison tends to indicate unsuitability. His CDC-128s properly could be considered under § 2402(b) as pertaining to his social history and mental state.

Dang's superficial understanding of his crime is certainly not a "serious mental problem" within the meaning of the circumstance specifically listed as tending to show unsuitability, see § 2402(c)(5), but could be considered under § 2402(b), which specifically allows the BPT to consider a great range of relevant and reliable information, such as the prisoner's "past and present attitude toward the crime," social history and mental state. See RT 41-43 (psychologist's report of December 8, 2004, noted that Dang seemed to have an inadequate grasp of how harmful his criminal conduct had been to the victims and survivors).

#### d. Parole Plans

The BPT's decision to find Dang unsuitable was based also on the BPT's belief that his parole plans were lacking in certainty. Dang had not arranged for a place to live, other than a

12

Salvation Army homeless shelter that might be able to take him for up to a week, but operated on a first-come, first-served basis. And he had no job arranged, although the BPT did note he had marketable skills. The BPT decision stated that Dang needed to have a plan for life in California in case he was not deported, and needed some support letters from his family in Vietnam saying he had a place to live and work if he was going to return to Vietnam. See RT 65.

The BPT properly could consider the uncertain nature of the parole plans in support of its decision under § 2402(b), which allows the BPT to consider "any other information which bears on the prisoner's suitability for release." The regulations do not require that a prisoner have alternative plans lined up, i.e., one set for here and another in the event of removal from the United States, but Dang had no firm parole plans in either place. Dang's statement indicated his desire to stay in the United States, see RT 62, but he had no firm plan for parole if he did so. And he had no letters indicating that his family would be receptive to housing him and giving him a job if he returned to Vietnam. Dang's lack of planning looked a little less damaging because he had an impressive $4,000 in the bank, see RT 41, but that is not enough to retire on and there was still some evidence that the absence of firm plans for life on parole tended to indicate unsuitability to be released on parole. In light of Dang's admission that before he was incarcerated he had committed property crimes to pay for living expenses, his lack of effort to make firm parole plans could reasonably be seen as greatly increasing the likelihood he would return to criminal activity to support himself.

e.      There Was Enough Evidence To Support The Decision

The BPT noted that Dang had various in-prison achievements, but concluded that the positive factors did not outweigh the factors discussed above showing unsuitability. The factors listed by the BPT in support of its determination that Dang was not suitable for parole had some evidentiary support. And the factors were factors that could be considered in determining parole suitability. The Orange County Superior Court's rejection of Dang's claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard.

B.     Biased Decision-Maker Claim

Dang urges that the BPT was a biased decision-maker because it routinely characterizes murders as exceptionally heinous, atrocious or cruel. This claim was rejected by the state courts. Dang has not shown how the state court rejection of his claim was incorrect.

Dang submitted scores of form declarations from other prisoners who uniformly said that the BPT "cited the circumstances of my commitment offense as the primary reason for denying parole, (i.e. the crime was particularly or especially cruel, callous, heinous or egregious)." Petition, Attachment A (errors in source). This evidence does not prove a biased decision-maker. It is not surprising that the same wording would be used because that wording is the wording used in the regulation to describe the kind of crime that shows unsuitability. When a decision-maker strays from the particular language in a legal standard, the decision then becomes vulnerable to a claim that the wrong standard was used. See, e.g., Visciotti v. Woodford, 288 F.3d 1097, 1109 (9th Cir. 2002) (state court erred by mischaracterizing a test as one "whether a more favorable result was probable" instead of of a "reasonable probability" of a different result), overruled by Woodford v. Visciotti, 537 U.S. 19, 23-24 (2002) (per curiam) (state court identified the right test twice and its failure to use the modifier "reasonably" in front of "probable" in other locations in the decision was an imprecision but not an error). The phrase "some evidence" has been used seventeen times in this order; what may look to the prisoner like a rote recitation is actually an application of the law to his case. The fact that the BPT focused on the commitment offense also does not mean that it was a biased decision-maker, as the commitment offense is a very important circumstance in evaluating a prisoner's parole suitability.

The generic nature of the form declarations makes them unhelpful. Without knowing the particulars of each declarant's crime, one cannot say that the declarant's crime was improperly described as especially cruel, heinous or atrocious. While there is some appeal to Dang's argument that not all murders can be exceptionally cruel, heinous or atrocious, it also raises the question of whether the parole standards must be lowered if the general trend is to more vicious killings. For example, if all murders in one year are accomplished by torturing and then

14

decapitating the victims, none of those murders could be called especially cruel, heinous or atrocious under Dang's reasoning because torture and decapitation are the norm within that group. Another reason why the declarations are not helpful is that there is no showing that the same BPT panel heard all the declarants' cases as well as Dang's case. Different commissioners comprise different BPT panels and different governors appointed different commissioners. A habeas petitioner would have to show that the particular panel that heard his case was biased to obtain habeas relief and Dang has come nowhere close to doing so.

Dang has not shown that he fits within the narrow scope of the statute that allows evidentiary hearings in federal habeas actions to further develop the factual basis for his claim, 28 U.S.C. § 2254(e)(2). See, e.g., Williams (Michael) v. Taylor, 529 U.S. 420, 437 (2000) ("Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law").

**CONCLUSION**

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 20, 2006

_____
SUSAN ILLSTON
United States District Judge